# EXHIBIT 1
# Reply

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| GameTech International, Inc., *et al.*[1] | Case No. 12-11964 (PJW) |
| Debtors. | (Jointly Administered) |

**OMNIBUS REPLY OF THE DEBTORS IN SUPPORT OF (1) MOTION FOR ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) SCHEDULING A HEARING TO CONSIDER THE SALE; (IV) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (V) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (VI) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN EXECUTORYCONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF; AND (2) MOTION FOR ENTRY OF ORDERS: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO THE POSTPETITION LENDER PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (III) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF BANKRUPTCY CODE, (IV) PROVIDING ADEQUATE PROTECTION TO PREPETITION LENDER PURSUANT TO SECTIONS 361, 362. 363, AND 364 OF BANKRUPTCY CODE, AND (V) SCHEDULING FINAL HEARING**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")[2] hereby file this omnibus reply (the "**Reply**") in support of their (1) Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors'

---

[1] The Debtors in these chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are GameTech International, Inc. (2983), GameTech Arizona Corp. (9812), GameTech Canada Corp. (0001), and GameTech Mexico S. De R.L. de C.V. (5489).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bid Procedures Motion or the DIP Motion, as applicable.

Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale By Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside of the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief [Docket No. 135] (the **"Bid Procedures Motion"**) and (2) Motion for Entry of Orders: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Granting Liens and Superpriority Claims to the Postpetition Lender Pursuant to Section 364 of the Bankruptcy Code, (III) Authorizing Use of Cash Collateral Pursuant to Section 363 of Bankruptcy Code, (IV) Providing Adequate Protection to Prepetition Lender Pursuant to Sections 361, 362, 363, and 364 of Bankruptcy Code, and (V) Scheduling Final Hearing [Docket No. 137] (the **"DIP Motion"** and together with the Bid Procedures Motion, the **"Motions"**).

This Reply is specifically in response to (i) the objection of Official Committee of Unsecured Creditors (the **"Committee"**) to the Bid Procedures Motion [Docket No. 161] (the **"Committee Bid Procedures Objection"**), (ii) the objection of Richard T. Fedor, Sr. to the Bid Procedures Motion [Docket No. 150] (the **"Fedor Objection"** and, together with the Committee Bid Procedures Objection, the **"Bid Procedures**

**Objections"**)[3], and (iii) the objection of Committee to the DIP Motion [Docket No. 162] (the **"Committee DIP Objection"** and together with the Bid Procedures Objection, the "**Objections**").

In support of this Reply the Debtors submit the Declaration of Sudhin Roy in Support of (1) Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale By Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside of the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief and (2) the Debtors' Motion for Entry of Orders: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Granting Liens and Superpriority Claims to the Postpetition Lender Pursuant to Section 364 of the Bankruptcy Code, (III) Authorizing Use of Cash Collateral Pursuant to Section 363 of Bankruptcy Code, (IV) Providing Adequate Protection to Prepetition Lender Pursuant to Sections 361, 362, 363, and 364 of Bankruptcy Code, and (V) Scheduling Final Hearing which is attached hereto as Exhibit A (the **"Roy Declaration"**) and respectfully state as follows:

---

[3] The Bid Procedures Objections primarily address the Bid Procedures and the request for entry of the Bid Procedures Order. To the extent the Bid Procedures Objections address the ultimate Sale or the entry of the Sale Order, the Debtors reserve their rights to respond at the appropriate time.

**Factual Background**

1.      On July 2, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**").

2.      On August 9, 2012, the Office of the United States Trustee appointed the Committee.  On August 10, 2012, the Debtors filed the Motion, and a hearing on the Motion is scheduled for August 21, 2012 at 2:00 p.m.

3.      The proposed Sale represents the Debtors' best available opportunity to maximize the value of the Debtors' estates.  Based on the Debtors' estimates, the closing of the Purchase Agreement with the Stalking Horse should result in a significant distribution on account of the Debtors' unsecured claims.  The Purchase Agreement with the Stalking Horse also provides the opportunity for the Debtors to obtain a higher and/or better bid through a competitive process that the Debtors believe is appropriate under the circumstances of these cases.

4.      The related DIP Facility assures that the Debtors will have available liquidity to complete the Sale process and provides comfort to the Debtors' customers, suppliers and employees that the Debtors' business will remain stabile during the Sale process.

*The Sale Process*

5.      From the outset of these cases, the Debtors believed that a transaction with the Trust could provide a path to maximizing the value available to the Debtors' estates. The Trust, a competitor of the Debtors, had expressed interest in acquiring the Debtors' businesses prior to the Petition Date and is the Debtors primary creditor.  While the Debtors were willing to consider a transaction with the Trust, the Debtors were clear that

4

any such transaction would have to provide (a) the potential for a significant distribution to holders of unsecured claims, (b) funding for these cases, and (c) an opportunity for a meaningful competitive process.

6.     In order to create a potential option for the Debtors' estates, the Debtors filed their Emergency Motion for Entry of Emergency Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Priming Post-Petition Secured Financing; (B) Utilize Cash Collateral; and (C) Pay Certain Related Fees and Charges; (II) Granting Adequate Protection to the Debtors' Pre-Petition Secured Lender; and (III) Scheduling a Final Hearing [Docket No. 100] (the "**Alternative DIP Facility**").  The Alternative DIP Facility would have required a priming fight with the Trust.  The Motion for Alternative DIP Facility was scheduled to be heard on August 7, 2012.

7.     After extensive and at times contentious negotiations to resolve all of their issues including the Alternative DIP Financing, the Debtors were able to negotiate the Purchase Agreement with the Stalking Horse.   The Debtors believe the Purchase Agreement provides: (a) a valuable stalking horse purchase offer, (b) the framework for a competitive bidding process, and (c) a substantial potential distribution to unsecured creditors (potentially 100%), without taking into account any (i) overbids at Auction, or (ii) recoveries from Avoidance Actions.  The Debtors were also able to negotiation the DIP Facility which assured that funding would be available for the Debtors' business operations and administration of these cases.

8.     The primary issues raised by the Bid Procedures Objections are that the proposed Sale timeline is too short, the proposed Bid Procedures will chill competitive bidding, and that either the prior marketing of the Assets has been inadequate or the

proposed marketing efforts are inadequate. These concerns are unfounded.[4]

9.    The Debtors retained Kinetic Advisors LLC (**"Kinetic"**) on March 1, 2012, to assist in the evaluation of strategic alternatives and to render financial advisory services to the Debtors including restructuring and capital raising services, as well as a possible sale of Debtors' businesses.  Kinetic began marketing the Debtors' businesses in early May 2012.  Prior to the Petition Date, Kinetic contacted approximately 15 potential purchasers and/or investors about their interest in the Debtors' businesses.  While Kinetic was running this process during the month of May 2012, the Debtor's lender announced that it intended to sell the Debtor's debt.  A number of parties bid on the debt, including some who were brought in via this process conducted by Kinetic.  The Trust purchased the debt in June 2012.

10.    Since the Petition Date, Kinetic has also engaged in both formal and informal marketing of the Debtors' businesses.  In connection with the Sale process, Kinetic identified approximately 160 potential purchases for the Debtors' assets.  On August 14, 2012, Kinetic began distributing a teaser and form of nondisclosure agreement to each of those parties.  To date, 5 prospective purchasers have executed nondisclosure agreements.   Kinetic has also prepared a Confidential Information Memorandum and has worked with the Debtors to establish a data room to which prospective purchasers will be given access.

11.    Kinetic worked with the Debtors in designing the timeline for the Sale to assure that all prospective purchasers would have the opportunity to participate in the

---

[4] Both Bid Procedures Objections noted a discrepancy in the Bid Deadline proposed in the Bid Procedures Motion and Bid Procedures.  The Debtors will correct this discrepancy and clarify in any order granting the Motion, as well as the Bid Procedures attached to such order, that the Bid Deadline is September 17, 2012.

Sale process.   That process is based on (a) marketing beginning on August 14, 2012, (b) management presentations being held between September 4 - 14, 2012, (c) due diligence being completed and bid being submitted by September 17, 2012, and (d) an Auction being held on September 20, 2012.   The Debtors believe that this marketing process, particularly when combined with the marketing that occurred prior to the Petition Date, is more than sufficient to assure that all interested bidders have an opportunity to participate in the Sale process.

*The DIP Facility*

12.    In connection with the negotiations of the Purchase Agreement with the Stalking Horse and in order to address the Trust's objections to the Alternative DIP Facility, the Debtors also negotiated the DIP Facility with the Trust, which includes consent by the Trust to use of Cash Collateral.   The DIP Facility and use of Cash Collateral assures that the Debtors will have available liquidity to run their businesses, administer these cases, and complete the Sale process.

13.    Without use of Cash Collateral, the Debtors would be unable to operate their businesses or create a meaningful Sale process.   Also, since the Petition Date, and even prior thereto, the Debtors have faced considerable uncertainty among their customers, vendors, and other parties-in-interest in these cases.   Although the Debtors could potentially operate solely through the use of Cash Collateral, the proposed DIP Facility provides much-needed certainty to the Debtors, their employees, their customers, and their vendors, among others, that the Debtors' businesses will remain operating.

14.    The cost of the DIP Facility is relatively low.   The DIP Facility bears interests at a rate of 10% per annum and includes no fees other than reimbursement of the DIP Lender's costs and expenses.   It is also important to note that the DIP Facility is

structured so that it is essentially a pre-funding of a portion of the Cash Purchase Price under the Purchase Agreement. Under the Purchase Agreement, any portion of the $2,500,000 available and undrawn under the DIP Facility will be made available as Cash Purchase Price and will directly benefit the unsecured creditors. The Debtors anticipate only drawing on the DIP Facility to the extent necessary to maintain their businesses and pay the cost of administration of these cases and expect that a substantial amount of cash will be available to distribute on account of unsecured claims.

15.     Prior to agreeing to the terms of the DIP Facility, the Debtors requested that Kinetic run a process to determine what financing was available to the Debtors. Kinetic reached out to over 20 potential DIP lenders to raise financing on both a secured and unsecured basis. As a result of that process, the Debtors were not able to obtain any financing other than the Alternative DIP Facility. The Alternative DIP Facility provided a viable alternative for the Debtors to finance these cases but did not provide a clear exit strategy for the Debtors. The Alternative DIP Facility also required the Debtors to pay substantial fees, resulting in the Alternative DIP Facility being more expensive than the DIP Facility.

16.     Furthermore, the Trust had not consented to the Alternative DIP Facility. The Debtors expect that any litigation relating to the non-consensual use of Cash Collateral and/or alternative financing would be an expensive, drawn out process, increasing administrative costs to the Debtors' estates, increasing uncertainty among the Debtors' customers, vendors, and other parties-in-interest, and ultimately reducing available recoveries for all constituencies. It was also not clear to the Debtors that they would prevail in priming the Trust's liens.

17.     Therefore, when the Debtors, in their business judgment, determined that the Sale process was the best exit strategy and obtained the Purchase Agreement from the Stalking Horse, the Debtors also determined that the DIP Facility provided more attractive financing than was available under the Alternative DIP Facility or otherwise.

*Relief Requested*

18.     The Objections do not provide any meaningful path forward for the Debtors - let alone one that would provide more value than the Sale process proposed by the Debtors.  The Debtors submit that any delay in the Sale process or approval of the use of Cash Collateral and DIP Facility will only serve to damage the Debtors' businesses and the value thereof, diminish the value of the Sale transaction, and jeopardize the stalking horse bid.

<u>**Argument**</u>

**I.     <u>Reply to Bid Procedures Objections</u>**

*The Proposed Bid Procedures Are Appropriate In These Cases*

19.     As detailed above and in the Roy Declaration, the Debtors in consultation with Kinetic have designed a process that will provide for meaningful competitive bidding while still preserving the value provided by the Stalking Horse bid.  The Debtors negotiated the existing provisions of the Bid Procedures and Purchase Agreement vigorously, in good faith and in accordance with their sound business judgment.  A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used to sell assets of the estate.  <u>Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)</u>, 147 B.R. 650, 656-7 (Bankr. S.D.N.Y. 1992).

*The Schedule Is Appropriate*

20.    The Bid Procedures Objections suggest that additional time is necessary to assure a competitive Sale process.  Additional time is not necessary and, in fact, could serve to reduce value as a longer process will result in higher operating and administrative expenses which will reduce distributions to unsecured creditors.

21.    As an initial matter, the proposed schedule complies with all applicable requirements of the Bankruptcy Code, Bankruptcy Rules and Local Rules.[5]  As detailed above and in the Roy Declaration, the Debtors have carefully designed the process to maximize value.  In fact the Debtors began the marketing process before the approval of the Bid Procedures to assure that maximum time was available for the development of competitive bids.

22.    More importantly, the Debtors anticipate that without the proposed Bid Procedures, including, without limitation, the proposed schedule included therein, the value of the Assets could rapidly diminish.  While the Debtors have been able to operate on Cash Collateral, the Debtors business requires capital investment in order to maintain its value over the near term.  Without such investment, the value of the Debtors' business will deteriorate the longer these cases continue, which will reduce, not increase, value available to the Debtors' estates.

23.    Maximization of asset value and preventing business deterioration are sound business purposes, justifying approval of the Bid Procedures which are designed to achieve these two goals.  The proposed Bid Procedures will allow for the submission of Qualified Bids, and if Qualified Bids are received, will allow for the Debtors to conduct

---

[5] The Committee Procedures Objection argues that expedited consideration of the Sale is not appropriate. While the Debtors did seek expedited consideration of the Bid Procedures, the Sale is not being expedited. Thus, the arguments made by the Committee that an "expedited" Sale process is not appropriate are simply inapplicable here.

an Auction to further increase the likelihood that the Debtors receive the greatest possible consideration for the Assets.

24.     All creditors and parties in interest have received and will receive adequate notice of the Bid Procedures and the Sale Hearing.  These notice provisions are designed to ensure that any parties interested in these cases, including those parties potentially interested in bidding on the Debtors' assets and any party whose interests are potentially implicated by the proposed sale, and are given adequate notice of the Sale and able to respond or act accordingly.

25.     The Debtors, therefore, submit that the current schedule is a reasonable schedule given the Debtors current circumstances and previous marketing efforts and provides the most efficient way to maximize the value of their estates.

*The Investigation of the Liens Can Be Completed Before the Auction*

26.     The Committee objects to the credit bid because it has not yet been able to investigate the Trust's liens.  In the first few weeks of these cases, it was uncertain whether a committee would be formed.  In fact, no committee was formed at the initial formation meeting held on July 12, 2012.  As a result of the late formation of the Committee on August 9, 2012, the Debtors undertook their own lien perfection analysis, which is materially complete.  The Debtors have concluded that, with limited possible exceptions which the Debtors are still reviewing, the Trust has a perfected security interest on the real and personal property of the Debtors.

27.     The Debtors are willing to share their analysis and any underlying documents with the Committee.   Under these circumstances, the Debtors believe that the Committee will be able to complete its own analysis before the proposed Auction date -- September 20, 2012. Further, there is nothing in the Bid Procedures Order or DIP

Financing Order that impairs the Committee's right to timely challenge the Trust's liens or claims.

*The Bid Protections and Break-Up Fee Are Appropriate*

28.    In the Committee Bid Procedures Objection, the Committee argues that the Breakup Fee and Reimbursement Amount should not be approved because neither the Debtors nor the Stalking Horse can demonstrate that these bid protections are necessary or that they will serve as a catalyst to higher bids.  The Committee is incorrect.  Notably, after negotiations with the U.S. Trustee, the Stalking Horse and Debtors have also agreed to reduce the Breakup Fee to $335,000, to which the U.S. Trustee has no objection.

29.    In <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)</u>, 181 F.3d 527 (3d Cir. 1999), the Third Circuit established the standard for determining the appropriateness of bidding protections such as break-up fees and expense reimbursement provisions.  The Third Circuit has identified at least two instances where bidding incentives may benefit the estate and should be approved:

> (i) If assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited.

> (ii) When the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.

<u>O'Brien</u>, 181 F.3d at 537.

30.    Consistent with <u>O'Brien</u>, in these cases the Stalking Horse would not have expended the time and energy necessary to negotiate and enter into the Purchase Agreement absent the Breakup Fee and Reimbursement Amount provisions.  In addition, had the Stalking Horse not made its bid, the Debtors would not have the benefit of a floor

bid.  The ability to offer the Breakup Fee and Reimbursement have created the possibility of a competitive auction to maximize the value of the Debtors' estates. In addition, the Breakup Fee and Reimbursement Amount are only payable if a higher and better offer actually closes, thus demonstrating that the Stalking Horse's baseline bid did in fact induce a better offer.

*There Is No Requirement To Demonstrate That A Confirmed Plan Is Not Feasible Before Undertaking A Section 363 Sale Process*

31.     Courts in this Circuit have repeatedly held that a bankruptcy court may approve a sale of all, or substantially all, of a debtor's business pursuant to section 363(b) of the Bankruptcy Code outside of a chapter 11 plan if: (a) a sound business reason supports the sale; (b)  accurate and reasonable notice of the sale has been provided; (c) the sale price is adequate (fair and reasonable); and (d) the purchaser acts in good faith. See, e.g., In re Decora Indus., 2002 WL 32332749, at *2 (D. Del. May 20, 2002), In re StroudFord, Inc., 163 B. R. 730, 732-33 (Bankr. M. D. Pa. 1993) (citing In re Abbotts Dairies of Pennsylvania, Inc., 788 F. 2d 143 (3d Cir. 1986)).  "[A] sale under § 363(b) is intended to benefit the estate by minimizing loss of value to the estate." In re Trans World Airlines, Inc., 2001 WL 1820326, at *11 (Bankr. D. Del. Apr. 2, 2001).

32.     As described herein and in the Roy Declaration, the Sale is being made for a sound business purpose.  Prior to the Petition Date, the Debtors were in default under the Prepetition Loan Agreement, and were unable to obtain alternative financing outside of chapter 11.  The Debtors are unable to continue to operate their businesses indefinitely without access to DIP financing.  Further, an extended bankruptcy process results in administrative expenses that will erode recovery to the unsecured creditors in the event a higher bid of the assets is not available.

33.     The Debtors have determined that it is in the best interest of their estates to arrange for a sale of their businesses and assets on the terms and conditions set forth in the Motion and Bid Procedures.  The Debtors cannot continue to operate their businesses for the time required to confirm and consummate a plan without serious risk of material decline in value of the businesses resulting loss to all creditor constituencies.

34.     The Debtors believe the Purchase Price (including the extent of its section 363 credit bid to be determined prior to the Auction) offered by the Stalking Horse is fair and reasonable and exceeds any offer from other parties to date.  In addition, after further marketing the Purchase Price will be subject to higher and better offers through the Bid Procedures and, if other Qualified Bidders submit Qualified Bid, the Auction.  "The auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction."  Trans World Airlines, 2001 WL 2001 WL 1820326, at *4.  The Bid Procedures process will ensure that fair value is received.  Again, the Debtors cannot wait for an alternative transaction or restructuring that may take several months to materialize, if one does in fact ever materialize, without significant harm to their businesses and further deterioration of the value thereof..

*The Calculation of the Purchase Price Does Not Discourage Bidding*

35.     The Fedor Objection argues that the calculation of the Purchase Price in the Purchase Agreement is unclear and will chill competitive bidding.  However, payment of cash, credit bid of secured debt, and assumption of liabilities are by no means unusual in an asset sale transaction and are easily valued for purposed of determining higher and better offers.  The Debtors and their advisors intend to make every effort to ensure a fair and open process to secure the highest and best value for the Debtors'

estates, and communicate with interested parties to the extent necessary to ensure that bidders understand the bidding requirements.

*Alteration to Allow for Plan Proposals Is Not Required*

36.    In the Fedor Objection, Mr. Fedor argues that the Bid Procedures should be modified to allow for parties to submit proposals for alternative transactions.  Such a modification is not necessary because (a) the Bid Procedures do not prohibit such proposals, and (b) the Debtors have preserved their ability to consider other proposals to the extent provided.  See Bid Procedures at ¶ 5(b), (c).

37.    To the extent a proposal for an alternative transaction is provided, the Purchase Agreement also provides the Debtors with a "fiduciary out" if in their judgment that proposal is better than the Purchase Agreement.  See Article 8.01(e) of the Purchase Agreement.  Therefore, modification of the Bid Procedures is not necessary to allow for the Debtors to consider alternative proposals if any are provided.

*The Additional Fedor Objections Are Without Merit*

38.    Mr. Fedor objects to the Bid Procedures because the form of nondisclosure agreement is not being filed.  The Bid Procedures are clear as to how a bidder obtains a form nondisclosure agreement and, in fact, several potential bidders already have obtained that agreement.[6]   However, the Debtors have also attached the form of nondisclosure agreement to this Reply as Exhibit B.

39.    Mr. Fedor also objects to certain language contained in paragraph 3 of the Bid Procedures that allows the Debtors to make determinations regarding the sharing of specific information with potential bidders.  The Debtors have established a data room and are providing all potential bidders that sign a nondisclosure agreement with access to

_____

[6] As of the filing of this Reply, Mr. Fedor has not requested the form of nondisclosure agreement.

that data room.  While the Debtors do not anticipate limiting any potential bidders access to information, the language in the Bid Procedures simply preserves the Debtors' right to do so if necessary in their business judgment.  Of course, any such party would have recourse to the Court if they believed that the Debtors actions were inappropriate. Therefore, the Debtors submit deletion of the language is not necessary.

40.    Mr. Fedor further objects to the Bid Procedures because he believes they are unclear that if one other Qualified Bid is received, the Debtors will hold an Auction. As the Stalking Horse Bid is a Qualified Bid by the terms of the Bid Procedures, this change is not necessary.  However the Debtors will clarify this provision in the Bid Procedures.

41.    Finally, Mr. Fedor objects to the Bid Procedures because he wishes to attend the Auction.  Subject to consent of the Trust and the Committee, the Debtors will clarify the Bid Procedures Order to provide that Mr. Fedor and his counsel may attend the Auction.

## II.    Reply to DIP Objection

42.    In its limited DIP Objection, the Committee objects to certain specific provisions of the DIP Facility.  Two of those objections go to the basic terms on which the DIP Facility is being provided.  While the Debtors would not be opposed to either the modification of the repayment provisions suggested by the Committee or the modification of the default provision, the Trust has not agreed to those modifications.  A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g., Trans World Airlines, Inc. v. Travelers Intl AG* (*In re Trans World Airlines, Inc.*)*,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such

facility "reflect[ed] sound and prudent business judgment."); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).  Moreover, for the reasons set forth above, the DIP Facility is still the best available financing for the Debtors whether such modifications are made.

43.     With regard to the Committee's concerns regarding Budget amendments and subject to consent of the Trust, the Debtors will modify the proposed form of Order to provide that the Committee receives copies of any Budget amendments.  The Debtors have also indicated a willingness to work with the Committee to assure that the Committee can monitor the Budget and compliance therewith.

44.     With regard to the funding for the Committee professionals, the Debtors have included in a revised Budget provided to the Committee and the Trust the fees requested by the Committee professionals, which the Debtors believe are reasonable. The revised Budget is attached hereto as <u>Exhibit C</u> and is subject to the consent of the Trust.

### Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter an order (i) granting the Motions; (ii) overruling the Objections; and (iii) granting the Debtors such other and further relief as is just and proper.

Dated:  August 20, 2012     Respectfully Submitted,

            GREENBERG TRAURIG, LLP

            */s/ Dennis A. Meloro*
            Dennis A. Meloro (DE Bar. No. 4435)
            1007 North Orange Street, Suite 1200
            Wilmington, Delaware 19801
            Telephone: 302-661-7000
            Facsimile:  302-661-7360
            Email: melorod@gtlaw.com

            -and-

            David D. Cleary
            2375 East Camelback Rd., Suite 700
            Phoenix, Arizona 85016
            Telephone: (602) 445-8000
            Facsimile: (602) 445 8100
            Email: clearyd@gtlaw.com

            -and-

            Nancy A. Mitchell
            Matthew L. Hinker
            200 Park Avenue
            New York, New York 10166
            Telephone: (212) 801-9200
            Facsimile: (212) 6400
            Email: mitchelln@gtlaw.com
               hinkerm@gtlaw.com

            *Counsel for the Debtors*
            *and Debtors-in-Possession*

*NY 242,278,238v4 8-20-12*

**<u>EXHIBIT A TO REPLY</u>**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re

GameTech International, Inc., *et al.*[1]

Debtors.

Chapter 11

Case No.  12-11964 (PJW)

(Jointly Administered)

**DECLARATION OF SUDHIN ROY IN SUPPORT OF (1) MOTION FOR
ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES
RELATING TO SALE OF THE DEBTORS' ASSETS; (II) APPROVING
BID PROTECTIONS; (III) SCHEDULING A HEARING TO CONSIDER
THE SALE; (IV) APPROVING THE FORM AND MANNER OF NOTICE
OF SALE BY AUCTION; (V) ESTABLISHING PROCEDURES FOR
NOTICING AND DETERMINING CURE AMOUNTS; AND (VI) GRANTING
RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT
AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE
THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; AND (IV) GRANTING RELATED RELIEF; AND (2) MOTION FOR ENTRY
OF ORDERS: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY
CODE, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO THE
POSTPETITION LENDER PURSUANT TO SECTION 364 OF THE BANKRUPTCY
CODE, (III) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO
SECTION 363 OF BANKRUPTCY CODE, (IV) PROVIDING ADEQUATE
PROTECTION TO PREPETITION LENDER PURSUANT TO SECTIONS 361, 362. 363,
AND 364 OF BANKRUPTCY CODE, AND (V) SCHEDULING FINAL HEARING**

Sudhin Roy hereby declares, under penalty of perjury, as follows:

---

[1] The Debtors in these chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are GameTech International, Inc. (2983), GameTech Arizona Corp. (9812), GameTech Canada Corp. (0001), and GameTech Mexico S. De R.L. de C.V. (5419).

I am Senior Managing Director of Kinetic Advisors LLC (**"Kinetic"**).[2] I submit this declaration (the **"Declaration"**) in support of the Debtors' (1) Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale By Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside of the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief [Docket No. 135] (the **"Bid Procedures Motion"**) and (2) Motion for Entry of Orders: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Granting Liens and Superpriority Claims to the Postpetition Lender Pursuant to Section 364 of the Bankruptcy Code, (III) Authorizing Use of Cash Collateral Pursuant to Section 363 of Bankruptcy Code, (IV) Providing Adequate Protection to Prepetition Lender Pursuant to Sections 361, 362, 363, and 364 of Bankruptcy Code, and (V) Scheduling Final Hearing [Docket No. 137] (the **"DIP Motion"** and together with the Bid Procedures Motion, the **"Motions"**).

1.    I have approximately 15 years of experience in corporate restructuring, mergers and acquisitions, and capital raising for middle-market companies. I have held my current position with Kinetic since 2009. Prior to joining Kinetic, I worked at Oracle Partners, LLC, which is a private equity fund of which I was a founder. Oracle was an investor in numerous

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bid Procedures Motion or DIP Financing Motion, as applicable.

companies needing growth capital or facing turnaround situations.  From 2001 to 2006, I served as President and Chief Executive Officer of PricewaterhouseCoopers Securities LLC where I led a team of investment bankers and restructuring advisors.  At PricewaterhouseCoopers, I focused on financial advice to middle-market companies needing services related to capital raising, mergers and acquisitions, restructuring and bankruptcy.  I hold a Bachelor of Technology in Chemical Engineering from the Indian Institute of Technology and a Master of Business Administration from the University of Texas at Austin.

2.      Kinetic was retained by the above-captioned debtors and debtors-in-possession (collectively, the **"Debtors"**) on March 1, 2012, to assist in the evaluation of strategic alternatives and to render financial advisory services to the Debtors including restructuring and capital raising services, as well as a possible sale of the company.  In late April 2012, Kinetic was retained to provide consulting services to the Debtors relating to the Debtors' loan agreement..  The Debtors have also filed an application to retain Kinetic as their financial advisors in these chapter 11 cases, which application was approved by the Bankruptcy Court.

3.      Since the commencement of its engagement, Kinetic has, among other things, (a) familiarized itself with the Debtors' businesses, (b) evaluated the Debtors' liquidity position and projected cash flow, (c) evaluated the range of financial and strategic alternatives available to the Debtors, and (d) performed a valuation of the Debtors' businesses.

4.      I am familiar with the Debtors and their businesses as well as the Debtors' activities in these chapter 11 cases.  I have supervised or been involved with each of the tasks performed by Kinetic set forth above including supervising the valuation of the Debtors' businesses undertaken by Kinetic.  I, or people from Kinetic working at my direction, have

assisted the Debtors' management with the preparation of the Debtors' cash flow budgets and the financial information submitted in connection with the Motions.

**The Bidding Procedures and Proposed Sale**

5.     The proposed Sale represents the Debtors' best available opportunity to maximize the value of the Debtors' estates.  The closing of the Purchase Agreement with the Stalking Horse should result in a significant distribution (which could be as high as 100%) on account of the Debtors' unsecured claims.  The Purchase Agreement with the Stalking Horse also provides the opportunity for the Debtors to obtain a higher and/or better bid through a competitive process.

6.     After extensive and at times contentious negotiations to resolve all of their issues including the Alternative DIP Financing, in which I was personally involved, the Debtors were able to negotiate the Purchase Agreement with the Stalking Horse.  The Purchase Agreement provides: (a) a valuable stalking horse purchase offer, (b) the framework for a competitive bidding process, and (c) a substantial potential distribution to unsecured creditors (potentially 100%) without taking into account any (i) overbids at Auction, or (ii) recoveries from Avoidance Actions.

7.     Kinetic began marketing the Debtors' businesses in early May 2012.  Prior to the Petition Date, Kinetic contacted approximately fifteen (15) potential purchasers and/or investors about their interest in the Debtors' businesses.  While Kinetic was running this process during the month of May 2012 the Debtors' lender announced that it intended to sell Debtors' debt.  A number of parties bid on the debt, including some who were brought in via the process conducted by Kinetic.  The auction concluded with the Trust purchasing the debt in June 2012.

8.     Since the Petition Date, Kinetic has also engaged in both formal and informal marketing of the Debtors' businesses.  In connection with the Sale process, Kinetic identified approximately 160 (97 strategic and 63 financial) potential purchases for the Debtors' Assets. On August 14, 2012 Kinetic commenced distributing a teaser and form of nondisclosure agreement to each of those parties.   To date, 5 prospective purchasers have executed nondisclosure agreements.  Kinetic has also prepared a Confidential Information Memorandum and has worked with the Debtors to establish a data room, to which prospective purchasers will be given access.

9.     Kinetic worked with the Debtors in designing the timeline for the Sale to assure that all prospective purchasers would have the opportunity to participate in the Sale process. That process is based on (a) marketing beginning on August 14, 2012, (b) management presentations being held between September 4 - 14, 2012, (c) due diligence being completed and bid being submitted by September 17, 2012, and (d) an Auction being held on September 20, 2012.

10.     The marketing process described above is more than sufficient to assure that all interested bidders have an opportunity to participate in the Sale process.  Additional time is not necessary to assure a competitive Sale process, and in fact could serve to reduce value as a longer process will result in higher operating and administrative expenses which will reduce distributions to unsecured creditors.

11.     The Debtors, in consultation with Kinetic, have designed a process that will provide for meaningful competitive bidding while still preserving the value provided by the Stalking Horse bid.  The Debtors negotiated the existing provisions of the Bidding Procedures

and Purchase Agreement vigorously, in good faith and in accordance with their sound business judgment.

12.     Without the proposed Bidding Procedures, including, without limitation, the proposed schedule included therein, the value of the Assets could rapidly diminish.  While the Debtors have been able to operate on Cash Collateral, the Debtors are unable to continue to operate their businesses indefinitely without access to DIP financing.  Without such investment, the value of the Debtors' business will deteriorate the longer these cases continue.  Further, an extended bankruptcy process results in administrative expenses that will erode recovery to the unsecured creditors in the event a higher bid of the assets is not available.

13.     The proposed Bidding Procedures will allow for the submission of Qualified Bids, and if Qualified Bids are received, will allow for the Debtors to conduct an Auction to further increase the likelihood that the Debtors receive the greatest possible consideration for the Assets.

**The Marketing Process for DIP Financing and the Proposed DIP Facility**

14.     In connection with the negotiations of the Purchase Agreement with the Stalking Horse and in order to address the Trust's objections to the Alternative DIP Facility, the Debtors also negotiated the DIP Facility with the Trust, which includes consent by the Trust to use Cash Collateral.  The DIP Facility and use of Cash Collateral assure that the Debtors will have available liquidity to run their businesses, administer these cases, and complete the Sale process.

15.     Since the Petition Date, the Debtors, with the assistance of Kinetic, have assessed the financing needs of the Debtors and explored various financing alternatives.  The Debtors solicited numerous proposals for debtor-in-possession financing from parties including their Prepetition Agent.  Kinetic contacted more than twenty parties, including traditional lenders, equity shareholders, strategic investors, and various non-traditional capital sources.

16.    Without use of Cash Collateral, the Debtors would be unable to operate their businesses or create a meaningful Sale process.  Also, since the Petition Date, and even prior thereto, the Debtors have faced considerable uncertainty among their customers, vendors, and other parties-in-interest in these cases.  Although the Debtors could potentially operate solely through the use of Cash Collateral, the proposed DIP Facility provides much-needed certainty to the Debtors, their employees, their customers, and their vendors, among others, that the Debtors' businesses will remain operating.

17.    The costs of the DIP Facility are reasonable.  The DIP Facility bears interest at a rate of 10% per annum and includes no fees other than reimbursement of the DIP Lender's costs and expenses.  The DIP Facility is structured so that it is essentially a pre-funding of a portion of the Cash Purchase Price under the Purchase Agreement.  Under the Purchase Agreement, any portion of the $2,500,000 available and undrawn under the DIP Facility will be made available as Cash Purchase Price and will directly benefit the unsecured creditors.  The Debtors anticipate only drawing on the DIP Facility to the extent necessary to maintain their businesses and pay the cost of administration of these cases and expect that a substantial amount of cash will be available to distribute on account of unsecured claims.

18.    Prior to agreeing to the terms of the DIP Facility, the Debtors requested that Kinetic run a process to determine what financing was available to the Debtors.  Kinetic reached out to over 20 potential DIP lenders to raise financing on both a secured and unsecured basis.  As a result of that process, the Debtors were not able to obtain any financing other than the potential priming debtor-in-possession financing offered by Gibraltar Business Capital which was the subject of the Debtors' Emergency Motion for Entry of Emergency Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Priming Post-Petition Secured Financing; (B) Utilize

Cash Collateral; and (C) Pay Certain Related Fees and Charges; (II) Granting Adequate Protection to the Debtors' Pre-Petition Secured Lender; and (III) Scheduling a Final Hearing [Docket No. 100] (the "**Alternative DIP Facility**").  The Alternative DIP Facility provided a viable alternative for the Debtors to finance these cases but did not provide a clear exit strategy for the Debtors.   The Alternative DIP Facility also required the Debtors to pay substantial fees, resulting in the alterative DIP facility being more expensive than the DIP Facility.

19.    Any delay in the Sale process or approval of the use of Cash Collateral and DIP Facility will only serve to damage the Debtors' businesses and the value thereof, diminish the value of the Sale transaction, and jeopardize the stalking horse bid.

20.    The Debtors are unable continue to operate their businesses indefinitely without access to DIP financing.  Further, an extended bankruptcy process results in administrative expenses that will erode recovery to unsecured creditors in the event a higher bid of the assets is not available.  The Debtors cannot continue to operate their businesses for the time required to confirm and consummate a plan without serious risk of exhausting their liquidity, which would result in lost recovery  to all creditor constituencies

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: August 20, 2012

_____

SUDHIN ROY

**EXHIBIT B TO REPLY**

**CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT**

This Confidentiality and Nondisclosure Agreement (the "**Agreement**") is made and entered into as [DATE], 2012 (the "**Effective Date**"), by and between GameTech International, Inc. a Delaware corporation, ("**GII**") and its wholly-owned subsidiaries GameTech Canada Corporation, GameTech Arizona Corp. and GameTech Mexico S. de R.L. de C.V (collectively with GII, the "**Debtors**" or "**GameTech**"), [PARTY], having a principal address of [ADDRESS] ("**Recipient**").

**WHEREAS**, a request has been made by Recipient for certain confidential and proprietary information in connection with its investment in the Debtors including, without limitation, a potential purchase of assets from the Debtors (the "**Transaction**") in connection with the chapter 11 cases pending in the United States Bankruptcy Court (the "**Bankruptcy Court**") and the Debtors are willing to disclose to the Recipient and its Representatives such confidential and proprietary information at their discretion in consideration of the following and on the terms set forth below.

**NOW THEREFORE**, in consideration of the foregoing premises and mutual promises hereinafter contained, Recipient agrees as follows:

1.  **DEFINITIONS.** As used in this Agreement, the words below are defined as follows:

    A.  **Affiliate** of a party means any other entity directly or indirectly Controlling, Controlled by or under common Control with that party as of the date of this Agreement.

    B.  **Confidential Information** means and refers to all information, documents, and materials, whether printed or in machine-readable form, oral or otherwise, furnished to Recipient or its Representatives by GameTech or its Representatives, including, but not limited to, processes, hardware, software, inventions (whether patentable or unpatentable and whether or not reduced to practice) and all improvements thereto, including, but not limited to, all products created, designed, and marketed by GameTech, its successors or assigns and any parent, subsidiary or affiliate of GameTech, all computer software (including data, disks, licenses, source code, and related documentation), all writings and other works subject to copyright protection, including but not limited to all copyrighted works and copyrightable works, technical data, trade secrets, ideas, designs, drawings, specifications, research, know-how, formulas, compositions, business methods, production plans, marketing and branding plans, customer information and lists, supplier information and lists, employee information and lists, current and potential customer or client information and lists, current and potential product information and lists, pricing and cost information, business and marketing plans (including proposals, and financial information and forecasts), all programs and procedures relating to the business operations of GameTech, including, but not limited to organizational structure, management, products and services, customer service, human resource and employee benefit policies, programs and services, and internal communication processes and technology tools, and all copies and tangible embodiments thereof (in whatever form or medium). Confidential Information shall include all information that should reasonably have been understood by Recipient, because of legends or other markings, the circumstances of disclosure, or the nature of them information itself, to be proprietary and confidential to GameTech, regardless of whether such information is marked "Confidential" or "Proprietary."

        The term **Confidential Information** shall *not* include information which: (i) was or is obtained by Recipient from a source other than the Debtors or their Representatives under circumstances where the source is entitled to make such disclosure without violation of any contractual or legal obligation to GameTech or other third party with respect to such information; (ii) is or becomes part of the public domain through no fault of Recipient or its Representatives; (iii) was or is independently ascertained or developed by Recipient or its Representatives without reference to any Confidential Information; (iv) was known to Recipient at the time of its disclosure to Recipient hereunder other than as a result of its disclosure to Recipient from a source in violation of a contractual or legal obligation to GameTech or other third parties with respect to such information; (v) was or is obtained by Recipient from the Debtors or their Representatives pursuant to a separate contractual right to receive such information; or (vi) is approved for disclosure and release by written authorization of GameTech.

    C.  **Control, Controlled or Controlling** means, as applicable, (i) the legal, beneficial or equitable ownership, directly or indirectly, of at least a majority of the equity interests of an entity; or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity or the election of a majority of the board of directors or comparable governing body of an entity, whether through the ownership of voting securities, by contract or otherwise.

    D.  **Representatives** of a party refers to the directors, officers, employees, agents or other representatives of such party, including, without limitation, attorneys, accountants, consultants, investment bankers and financial advisors.

    E.  **Review Material** refers to any reports, notes, analyses, compilations, files, data, forecasts, studies, memoranda or other documents created by Recipient or its Representatives which contain or otherwise reflect Confidential Information.

2.  **CONFIDENTIALITY OF DISCUSSIONS AND RELATIONSHIP.** Except as required by law, regulation, subpoena, legal process, or applicable judicial or governmental order or directive or communications with gaming regulatory authorities, neither Recipient nor its Representatives will, without the prior written consent of GameTech, disclose to any person (A) the Confidential Information that has been made available to Recipient or its Representatives, or (B) prior to the filing in the Bankruptcy Court of

any bid by the Recipient to purchase assets from the Debtors, any of the terms, conditions or other facts with respect to the Transaction including the status of any discussions.

3. **DUTY OF CARE.** Subject to Section 9 of this Agreement, Recipient agrees to use the same degree of care in protecting and using the Confidential Information received pursuant to this Agreement as Recipient would use in protecting its own Confidential Information. In no case will Recipient use less than a reasonable degree of care to maintain the confidentiality of the Confidential Information received.

4. **TERM.** The rights and obligations of the parties hereunder shall survive until terminated by mutual written consent.

5. **LIMITATIONS ON USE OF INFORMATION.** The Confidential Information will be used by the Recipient or its Representatives for the sole purpose of evaluating and/or pursuing the Transaction involving the Debtors and shall not be used, directly or indirectly, for any other purposes including without limitation the following:
   A. The Recipient and/or its Representatives and Affiliates shall not use any Review Material or Confidential Information for litigation or threat of litigation (unless such information is subsequently obtained through legal process) other than in proceedings in the Bankruptcy Court; provided, that to the extent Recipient, its Representatives or its Affiliates makes any filing with the Bankruptcy Court or in any legal proceeding which includes any Confidential Information, Recipient or its Representative and/or Affiliates shall (i) file such Confidential Information under seal or (ii) otherwise agree with the Debtors on an appropriate form of protective order; and
   B. The Recipient and/or its Representatives and Affiliates shall not use the Review Material or the Confidential Information to compete, either directly or indirectly, with GameTech.

   The Recipient shall reveal the Review Material and the Confidential Information only to its Representatives who need to know the same for the purpose of evaluating and/or entering into the Transaction and who are informed by Recipient of the confidential nature of the same. At GameTech's request, the Recipient shall, and shall cause its Representatives to, promptly return to GameTech any and all Confidential Information disclosed under this Agreement (including copies forwarded to Representatives), together with all copies thereof, and destroy all Review Material (and confirm such destruction in writing to GameTech). Alternatively, Recipient may destroy all Confidential Information and Review Material and confirm such destruction in writing to GameTech.

6. **NO SOLICITATION.** For a term of one (1) year following the Effective Date, Recipient will not, directly or indirectly through one or more of its Affiliates or Representatives, solicit, recruit, hire or otherwise engage any employees of GameTech other than as a result of a general public solicitation of employment by Recipient, its Representatives, or its Affiliates, not specifically directed toward employees of GameTech.

7. **LIABILITY FOR REPRESENTATIVES & AFFILIATES.** Recipient acknowledges and agrees that it will be responsible for any breach of this Agreement by its Affiliates and Representatives.

8. **COMPLIANCE WITH SECURITIES LAWS.** Recipient acknowledges that GII is a public company. Recipient further acknowledges and agrees that by receiving the Confidential Information of GameTech: (a) it may receive material non-public information about GameTech; (b) there exist securities laws that may restrict or eliminate its ability to sell or purchase securities of GameTech; and (c) it shall not, directly or indirectly, though one or more of its Affiliates or Representatives, acquire, offer to acquire, sell, offer to sell or otherwise trade in debt or equity securities in GameTech in violation of applicable securities laws.

9. **LEGALLY ORDERED DISCLOSURE.** If Recipient or anyone to whom it transmits Review Material pursuant to this Agreement is requested or required to disclose any Confidential Information, any of the Review Material, or any other fact or matter disclosure of which is prohibited by this Agreement, by administrative or judicial action (including without limitation by deposition, interrogatory, request for information in legal proceedings, subpoena, civil investigative demand, order, statute, rule, request or other requirement promulgated or imposed by a judicial, regulatory, self-regulatory, legislative body or governmental agency), Recipient, if legally permitted, will promptly after notice of such action notify GameTech of such action to give GameTech, at its sole cost and expense, the opportunity to seek any legal remedies available to it for the purpose of maintaining Review Material, Confidential Information and any other matter disclosure of which is prohibited by this Agreement, in confidence. If such protective order or other remedy is not obtained, or GameTech waives compliance with the provisions of this Agreement, Recipient will furnish only that portion of the Confidential Information, Review Material or other information which is required or requested.

10. **REPRESENTATIONS AND WARRANTIES.** GameTech makes no representation or warranty, express or implied, with respect to any Confidential Information and Recipient agrees that it is entitled to rely solely on the representations and warranties made to it by GameTech in any final definitive agreement regarding a possible Transaction. Confidential Information is provided "as is" with all faults and GameTech shall not be liable for the accuracy or completeness of the Confidential Information. Moreover, unless and until a definitive agreement is entered into, neither GameTech nor Recipient will be under any legal obligation of any kind whatsoever with respect to the Transaction except for the matters specifically agreed to in this Agreement. Further, neither GameTech nor its Representatives, nor any of the respective officers, directors, employees, agents, affiliates or controlling persons

shall have any liability to the Recipient, its Representatives or any other person resulting from their use of the Confidential Information.

11. **TITLE TO CONFIDENTIAL INFORMATION.** All the Confidential Information disclosed to, delivered to, or acquired by Recipient from GameTech hereunder shall be and remain the sole property of GameTech and nothing contained in this Agreement shall be construed as granting or conferring any rights by license or otherwise in the Confidential Information.

12. **NO OBLIGATION CREATED BY DISCLOSURE.** Disclosure of the Confidential Information disclosed by GameTech to Recipient shall not constitute any option, grant, or license to Recipient of such Confidential Information under any patent, know-how, or other rights heretofore, now, or hereinafter held by GameTech. It is understood and agreed that the disclosure by GameTech of the Confidential Information hereunder shall not result in any obligation on the part of GameTech to enter into any further agreement with Recipient with respect to the subject matter hereof or otherwise.

13. **SUCCESSORS AND ASSIGNS.** This Agreement is binding on the parties, their successors and assigns. No modification of this Agreement shall be effective unless in writing and signed by both parties hereto.

14. **NOTICES.** All notices, demands, requests or other communications given under this Agreement shall be in writing and be given by personal delivery, certified mail, return receipt requested, or nationally recognized overnight courier service to the address set forth above or as may subsequently in writing be requested.

15. **GENERAL**

    A.   **Waiver.** GameTech's waiver of any breach or failure to enforce any of the terms and conditions of this Agreement at any time shall not in any way affect, limit, or waive GameTech's right thereafter to enforce and compel strict compliance with every term and condition hereof.

    B.   **Equitable Relief.** In view of the irreparable harm and damage which could be incurred by GameTech in the event of any violation by Recipient of any provision of this Agreement, Recipient hereby consents and agrees that if there is a violation of any provision of this Agreement, GameTech shall be entitled to an injunction or similar equitable relief restraining Recipient from disclosing the Confidential Information or violating any other provision of this Agreement. Such equitable relief shall be in addition to any legal remedies that may be available to GameTech.

    C.   **Governing Law and Venue.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Nevada (without regard to its body of law regarding conflicts of law). In the event of any dispute arising out of or in connection with this Agreement, the parties irrevocably submit to the jurisdiction of the state and federal courts of the state of Nevada, and agree to bring such actions only in such courts ("Proceedings") and that neither will object to this venue on the grounds that it is an inconvenient forum. Nothing herein shall prevent either party from seeking to enforce an order issued in connection with such Proceedings in any other forum necessary or convenient to give effect to such order. The prevailing Party in any legal action brought by either party against the other and arising out of this Agreement shall be entitled, in addition to any other rights and remedies it may have, to reimbursement for its expenses, including court costs and reasonable attorneys' fees.

    D.   **Counterparts.** This Agreement may be executed in more than one counterpart, each of which shall be valid, binding and admissible as the original of the Agreement.

    E.   **Complete Agreement.** This Agreement constitutes the complete agreement between the parties hereto and supersedes and cancels any and all prior communications and agreements between the parties with respect to the disclosure of Confidential Information related to the Transaction described herein and the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto by their duly authorized representatives have executed this Agreement on the date first set forth above.

**GameTech International, Inc.**                          **Recipient:**

By: _____                    By: _____

Name: _____                    Name: _____

Title: _____                   Title:_____

**<u>EXHIBIT C TO REPLY</u>**

**GameTech International, Inc. - Debtor In Possession**
**Interim DIP Budget - Extended**
**21-Week Period Ending November 25, 2012**

| | Actual | | | | | | Projected | | | | | | | | | | | | | | | Totals |
| Receipts | 07/08/12 | 07/15/12 | 07/22/12 | 07/29/12 | 08/05/12 | 08/12/12 | 08/19/12 | 08/26/12 | 09/02/12 | 09/09/12 | 09/16/12 | 09/23/12 | 09/30/12 | 10/07/12 | 10/14/12 | 10/21/12 | 10/28/12 | 11/04/12 | 11/11/12 | 11/18/12 | 11/25/12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bingo | 240,943 | 285,086 | 318,271 | 280,320 | 360,739 | 290,050 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 6,275,409 |
| VLT | 54,112 | 122,496 | 18,984 | 90,604 | 33,274 | 79,289 | 193,750 | 49,750 | 73,200 | 44,000 | - | - | - | - | - | - | - | - | - | - | - | 759,459 |
| Other | 21,257 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 21,257 |
| DIP Receipts | | | | | | | | | | | | | | | | 100,000 | 100,000 | 100,000 | 100,000 | - | 100,000 | 500,000 |
| **Total Receipts:** | 316,312 | 407,582 | 337,255 | 370,924 | 394,013 | 369,339 | 493,750 | 349,750 | 373,200 | 344,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 400,000 | 400,000 | 400,000 | 400,000 | 300,000 | 400,000 | 7,556,125 |
| **Disbursements** | | | | | | | | | | | | | | | | | | | | | | |
| Payroll and Payroll Taxes | 15,800 | 286,310 | 4,205 | 274,642 | (1,734) | 259,176 | - | 244,000 | - | 246,000 | - | 232,000 | - | 232,000 | - | 232,000 | - | 232,000 | - | 232,000 | - | 2,488,399 |
| Insurance and Other Benefits | - | 11,420 | 8,132 | 88,217 | 7,937 | 79,289 | 14,000 | 81,000 | - | - | 14,000 | 8,000 | 73,000 | - | 14,000 | 8,000 | 73,000 | - | 14,000 | 8,000 | 73,000 | 574,995 |
| Auto Expenses | - | 23,234 | - | - | - | - | 24,000 | - | - | - | 24,000 | - | - | - | 24,000 | - | - | - | - | 24,000 | - | 119,234 |
| Employee Expenses | 14,107 | 9,370 | 11,655 | 17,900 | 2,699 | 4,186 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 284,917 |
| Regulatory Licensing | 35 | 49 | 12,388 | 9,500 | - | 388 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 172,360 |
| Sales and Use Taxes | - | 11,027 | 3,542 | 6,347 | 27,457 | - | 1,500 | 16,500 | 34,245 | 9,500 | 2,500 | 2,500 | 17,500 | 9,000 | 2,000 | 5,500 | 43,500 | 1,500 | 7,500 | 500 | 31,920 | 234,038 |
| Distributor Commissions | - | 50,034 | - | 71,065 | (6,767) | 120,410 | - | 115,000 | - | - | - | 115,000 | - | - | - | 115,000 | - | - | - | 115,000 | - | 694,742 |
| General Insurance | 12,449 | - | - | 4,434 | 14,810 | - | - | 4,600 | 12,000 | - | - | - | 4,600 | 12,000 | - | - | - | 4,600 | 12,000 | - | - | 81,493 |
| Rent | 6,474 | 41,245 | - | - | 44,849 | - | - | - | 48,000 | - | - | - | - | 48,000 | - | - | - | 48,000 | - | - | - | 236,568 |
| Jurisdiction Usage Fees | - | 28,880 | 3,220 | - | - | - | 30,000 | - | - | - | 30,000 | - | - | - | 30,000 | - | - | - | 30,000 | - | - | 152,100 |
| Bankruptcy Fees Incurred | | | | | | | 100,000 | 83,000 | 83,000 | 83,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 78,000 | 1,212,000 |
| Bankruptcy Fees Paid | | | | | | | | 252,000 | | | | | | | | | | | | | | 252,000 |
| Other | (1,969) | 709 | 3,329 | - | 6,540 | 91 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 53,700 |
| Product | - | 10,637 | 10,000 | 10,313 | 7,090 | - | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 488,040 |
| Suppliers/General Vendors | 936 | 5,964 | 1,011 | 7,786 | 14,243 | 28,514 | 20,000 | 30,000 | 30,000 | 20,000 | 30,000 | 30,000 | 20,000 | 30,000 | 30,000 | 20,000 | 30,000 | - | 60,000 | 20,000 | 30,000 | 458,454 |
| Shipping | - | 710 | 33,504 | 9,882 | 7,372 | 1,511 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 202,979 |
| Testing Fees | - | 10,000 | 15,912 | 5,000 | 14,265 | - | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | - | - | - | - | - | - | - | - | 80,177 |
| DIP Fees / Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1,667 | - | 1,667 |
| Senior Loan Interest | - | | | | | | | | | | | | | | | | | | | | | |
| **Total Disbursements:** | 47,832 | 489,589 | 111,898 | 505,086 | 138,761 | 493,565 | 262,500 | 899,100 | 280,245 | 431,500 | 251,500 | 423,500 | 381,100 | 477,000 | 246,000 | 411,500 | 407,500 | 433,500 | 239,500 | 460,500 | 395,920 | 7,787,863 |
| **Net Cash Flow** | 268,480 | (82,007) | 225,357 | (134,162) | 255,252 | (124,226) | 231,250 | (549,350) | 92,955 | (87,500) | 48,500 | (123,500) | (81,100) | (177,000) | 54,000 | (11,500) | (7,500) | (33,767) | 160,500 | (160,500) | 4,080 | (231,738) |
| Beginning Operating Cash Balance | 237,098 | 505,578 | 423,571 | 648,928 | 514,766 | 770,018 | 645,792 | 877,042 | 327,692 | 420,647 | 333,147 | 381,647 | 258,147 | 177,047 | 47 | 54,047 | 42,547 | 35,047 | 1,280 | 161,780 | 1,280 | 237,098 |
| **Ending Operating Cash Balance** | 505,578 | 423,571 | 648,928 | 514,766 | 770,018 | 645,792 | 877,042 | 327,692 | 420,647 | 333,147 | 381,647 | 258,147 | 177,047 | 47 | 54,047 | 42,547 | 35,047 | 1,280 | 161,780 | 1,280 | 5,360 | 5,360 |
| **Accrued Bankruptcy Fees** | -5,000 | 50,000 | 105,000 | 160,000 | 215,000 | 315,000 | 315,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 | 63,000 |
| Modified Cash Balance | 510,578 | 373,571 | 543,928 | 354,766 | 555,018 | 330,792 | 562,042 | 264,692 | 357,647 | 270,147 | 318,647 | 195,147 | 114,047 | -62,953 | -8,953 | -20,453 | -27,953 | -61,720 | 98,780 | -61,720 | -57,640 | -57,640 |

**FF0000DRAFT - TENTATIVE AND PRELIMINARY**

**GameTech International, Inc.- Debtor In Posession**
**Schedule of 7 Week Projected Professional Fees**
**(in $000s)**

| | | 07/15/12 | 07/22/12 | 07/29/12 | 08/05/12 | 08/12/12 | 08/19/12 | 08/26/12 | 09/02/12 | 09/09/12 | 09/16/12 | 09/23/12 | 09/30/12 | 10/07/12 | 10/14/12 | 10/21/12 | 10/28/12 | 11/04/12 | 11/11/12 | 11/18/12 | 11/25/12 | 7-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 5 | 6 | 7 | 8 | 9 | 10 | 5 | 6 | 7 | 8 | |
| **Accrued Professional Fees** | | | | | | | | | | | | | | | | | | | | | | |
| Debtors' Professionals | | | | | | | | | | | | | | | | | | | | | | |
| Greenberg Traurig | 1 | - | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 476 |
| Financial Advisors | | 30 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 505 |
| Claims Agent | | 5 | 5 | 5 | 5 | 5 | 25 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 162 |
| | | | | | | | | | | | | | | | | | | | | | | |
| Committee Professionals | | | | | | | | | | | | | | | | | | | | | | |
| Legal and Financial | | - | - | - | - | - | 25 | 25.0 | 25.0 | 25.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 320 |
| | | | | | | | | | | | | | | | | | | | | | | |
| Expenses | | 5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| **Total** | -60 | 40 | 55 | 55 | 55 | 55 | 100 | 83 | 83 | 83 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 1,422 |
| Cumulative | 15 | (5) | 50 | 105 | 160 | 215 | 315 | 398 | 481 | 564 | 642 | 238 | 316 | 394 | 472 | 550 | 628 | 238 | 316 | 394 | 472 | |

1 Applied to retainer

**GameTech International Inc.**
**Forecasted Tax Payments by Week**

Week Of:

| | 8/19/12 | 8/20/12 | 8/27/12 | 9/3/12 | 9/10/12 | 9/17/12 | 9/24/12 | 10/1/12 | 10/8/12 | 10/15/12 | 10/22/12 | 10/29/12 | 11/5/12 | 11/12/12 | 11/19/12 | 11/26/12 | 12/3/12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales/Use Tax** | - | 15,000 | | 7,000 | | | 15,000 | 7,000 | | 5,000 | 15,000 | | 7,000 | | | 15,000 | 7,000 |
| **Property Tax** | 1,500 | 1,500 | 1,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,000 | 2,000 | 500 | 500 | 1,500 | 500 | 500 | 500 | 1,500 | 500 |
| **CAD HST Tax** | | | 25,325 | | | | | | | | 28,000 | | | | | | |
| **Misc./Other** | | | 7,420 | | | | | | | | | | | | | | 7,420 |
| | **1,500** | **16,500** | **34,245** | **9,500** | **2,500** | **2,500** | **17,500** | **9,000** | **2,000** | **5,500** | **43,500** | **1,500** | **7,500** | **500** | **500** | **16,500** | **14,920** |
| | | | | | | | | | | | | | | | | | |
| Gaming Fees | **30,000** | | | | **30,000** | | | | **30,000** | | | | **30,000** | | | | |